UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------

JONATHAN ZARKOWER,

                Plaintiff,

     -against-

CITY OF NEW YORK, PETER FORTUNE, SALVATORE DIMAGGIO, ANDREW CHIN, PABLO DEJESUS, and JOHN AND JANE DOES 1–50,

                Defendants.

**19-cv-3843 (ARR) (RLM)**

**OPINION & ORDER**

--------------------------------------------------------------------

ROSS, United States District Judge:

Plaintiff, Jonathan Zarkower, brings this 42 U.S.C. § 1983 action alleging that he was unconstitutionally detained by police officers Salvatore Dimaggio, Andrew Chin, and Pablo Dejesus under the supervision of Captain Peter Fortune. He further claims that his detention occurred pursuant to an illegal policy, practice, or custom of the New York Police Department ("NYPD") promulgated and implemented by Peter Fortune and other unknown individuals. According to the complaint, Zarkower was arrested, taken to the precinct, issued a Desk Appearance Ticket ("DAT") authorizing his release, and then returned to a cell for another five hours for the sole purpose of being questioned by a detective about unrelated crimes committed by other people. The individual defendants Peter Fortune, Salvatore Dimaggio, Andrew Chin and Pablo Dejesus move to dismiss the action for failure to state a claim. The defendants argue that they are entitled to qualified immunity because the alleged conduct does not violate a clearly established right. I disagree. The complaint alleges an obvious violation of the Fourth Amendment right to be free from unreasonable detention. Thus, the defendants' motion is denied.

1

## BACKGROUND

On November 11, 2016 at 2:41 a.m., Zarkower was randomly stopped at checkpoint in Queens. Am. Compl. ¶ 14, ECF No. 13. He was arrested because his license had been suspended due to an unpaid fine. *Id.* ¶¶ 15–16. The arresting officer took him to the 114th Precinct, where his arrest was processed by defendant Salvatore Dimaggio, with assistance and under the supervision of defendant Andrew Chin. *Id.* ¶¶ 16–17. At 4:38 a.m. Dimaggio issued a desk appearance ticket ("DAT") to the plaintiff. *Id.* ¶ 18. A DAT is "an appearance ticket issued in lieu of detention, at the direction of a desk officer, for misdemeanors, violations, and certain Class 'E' felonies[.]" New York Police Department Patrol Guide ("NYPD PG") Pro. No. 208-27, available at https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/patrol_guide/208-27-dat.pdf; *see also* N.Y. Crim. Proc. Law § 140.20(2).

After the 4:38 a.m. issuance of the DAT, defendants Chin and Dimaggio continued to detain Zarkower in a cell at the 114th Precinct for approximately five hours. *Id.* ¶¶ 19, 21. Dimaggio told the plaintiff that the he was being held so that he could be questioned by a detective who came on duty in the morning. *Id.* ¶ 20. At 9:30 a.m., Zarkower was taken out of his cell to meet with Detective Pablo Dejesus. *Id.* at 21. Dejesus questioned Zarkower for five minutes about "whether he knew about crimes in the neighborhood, such as break-ins and assaults, and whether plaintiff had guns in his home." *Id*. After Zarkower denied any knowledge, he was released at 9:45 am. *Id.* ¶¶ 21–22.

NYPD's Patrol Guide Procedure No. 210-18entitled "Debriefing of Prisoners" describes a procedure for questioning arrestees about unrelated crimes. The stated purpose of the policy is "[t]o provide a central repository of criminal intelligence received from prisoners and improve communications and sharing of information among Department units." NYPD PG 210-18 at 1,

Depoian Decl., Ex. C, ECF No. 25-3. .The Scope of the policy is as follows:

> All prisoners in custody of this Department and all new arrestees must be debriefed by a member of the service. For the purposes of this procedure, the debriefing member of the service may be an investigator from the Detective Bureau, a Field Intelligence Officer (FIO), Anti-Crime/Street Narcotics Enforcement Unit (SNEU) supervisor, desk officer, etc. Police officers will not normally conduct debriefings.

*Id.* A positive debriefing is described as:

> Specific information received from a prisoner during the course of an interview regarding crime, criminal activity, or evidence related to a crime that is not related to the current arrest charges against the prisoner. For the purpose of this definition, a prisoner is to include new arrestees, and parolees, probationers, and inmates in custody.

*Id.*

Plaintiff alleges he is one of many individuals detained pursuant to this New York City policy, practice or custom of detaining persons who have been cleared for release on a DAT, for the sole purpose of unrelated debriefing. *Id.* ¶¶ 36–37. He brings this lawsuit on his own behalf and on behalf of this purported class. *Id.* ¶ 1.

Zarkower alleges four causes of action under § 1983. His first and second causes of action allege that his detention was excessive in violation of his constitutional rights. *Id.* ¶¶ 43–48. His third cause of action alleges supervisory liability for this constitutional violation against Fortune and John/Jane Does. *Id.* ¶¶ 49–51. His fourth cause of action alleges municipal liability against the city of New York. *Id.* ¶¶ 52–57. The individual defendants bring this motion to dismiss the first three causes of action on the basis of qualified immunity.

## DISCUSSION

### I.    Motion to Dismiss

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in

favor of the non-moving party. *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (citing *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). Thus, in deciding defendant's motion to dismiss, the court must accept the facts alleged in plaintiff's amended complaint as true. The complaint's allegations "must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Only "a plausible claim for relief survives a motion to dismiss." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 476 (2d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555)).

A qualified immunity defense is often a "'mismatch'" for a motion to dismiss and a "'bad ground of dismissal.'" *See Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013) (summary order) (quoting *McKenna v. Wright*, 386 F. 3d 432, 436 (2d Cir. 2004)). However, a qualified immunity defense is an appropriate ground for dismissal when "entitlement to qualified immunity can be established 'based [solely] on facts appearing on the face of the complaint.'" *Id.* at 813 (quoting *McKenna v. Wright*, 386 F. 3d at 436).

## II.     Qualified Immunity

"A police officer is entitled to qualified immunity from liability for his discretionary actions if either (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) (internal citations and quotation marks omitted).

### A.  Clearly Established Law

"A government official's conduct violates clearly established law when, at the time of the

4

challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). To meet this standard, the plaintiff must demonstrate "cases of controlling authority in [the] jurisdiction at the time of the incident" or at least "a consensus of cases of persuasive authority[.]" *Id.* at 746 (Kennedy, J., concurring) (citing *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). In a typical case, the right at issue should be defined with specificity, rather than at "a high level of generality." *Ashcroft*, 563 U.S. at 742; *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" (quoting *Saucier v. Katz* 533 U.S. 194, 205 (2001))).

However, the plaintiff need not provide a case "directly on point" addressing "the very action in question[.]" *Ashcroft*, 563 U.S. at 741; *Anderson*, 483 U.S. at 640. "General statements of the law are not inherently incapable of giving fair and clear warning" to officers. *United States v. Lanier*, 520 U.S. 259, 271 (1997) (citing *Anderson*, 483 U.S. at 640). The Supreme Court has recognized the existence of "the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *D.C. v. Wesby,* 138 S. Ct. 577, 590 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 745 (2002) (denying a qualified immunity defense in an Eighth Amendment suit where the "obvious cruelty inherent in the practice [of handcuffing inmates to a 'hitching post'] should have provided respondents with some notice that their conduct was unconstitutional"); *see also Cerrone*, 246

5

F.3d at 196 (rejecting a qualified immunity defense because defendant's conduct violated a clearly established Fourth Amendment right to be free from seizures without probable cause, even though there was no precedent applying this rule to the detention of a police officer); *Morse v. Cloutier*, 869 F.3d 16, 19, 29–30 (1st Cir. 2017) (warrantless entry into home was obviously unconstitutional, regardless of the fact that the particular circumstances were not addressed by prior case law); *Maxwell v. Cty. of San Diego*, 708 F.3d 1075, 1083 (9th Cir. 2013) (lengthy detention and questioning of witness for investigative purposes was "an obvious case" where qualified immunity could be denied despite "the lack of on-point precedent"); *Jackson v. Tellado*, 236 F. Supp. 3d 636, 664 (E.D.N.Y. 2017) (particular violent action was obviously excessive force); and *Johnson v. Wright*, 234 F. Supp. 2d 352, 367 (S.D.N.Y. 2002) (particular denial of medical treatment was obviously deliberate indifference).

### B. Objective Reasonableness

The second prong of the qualified immunity test asks whether the officials' conduct was objectively reasonable. "The objective reasonableness test is met—and the defendant is entitled to immunity—if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In a case involving a seizure without probable cause, "the arresting officer is entitled to qualified immunity as a matter of law if the undisputed facts and all permissible inferences favorable to the plaintiff show either (a) that it was objectively reasonable for the officer to believe that probable cause existed, or (b) that officers of reasonable competence could disagree on whether the probable cause test was met." *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987). A defendant is entitled to qualified immunity if his conduct was objectively reasonable, even if the right at issue was clearly established.

6

### III.     Desk Appearance Tickets

"Under the New York Criminal Procedure Law, rather than holding an arrestee in custody until a judge is available to conduct an arraignment, police officers have the discretion in certain cases to release the arrestee and issue him or her a so-called desk appearance ticket directing the arrestee to return to the criminal court at some future date to be arraigned." *Cabrera v. City of New York*, No. 16 CIV. 1098 (GBD), 2017 WL 6040011, at *3 n.2 (S.D.N.Y. Dec. 4, 2017) (citing *Bryant v. City of New York*, 404 F.3d 128, 132 (2d Cir. 2005). A DAT is a document directing a person to "appear in a designated local criminal court at a designated future time in connection with his alleged commission of a designated offense." N.Y. Crim. Proc. Law § 150.10(1). The DAT procedure operates as an alternative to holding an arrestee in custody until arraignment. *See* NYPD PG 208-27 (authorizing the issuance of a DAT "in lieu of detention"); *Bryant*, 404 F.3d at 132 ("Under [the DAT] procedure, the arrestee is released and must return to the criminal court at a future date for arraignment."); *Black Jack Distributors, Inc. v. Beame*, 433 F. Supp. 1297, 1301 (S.D.N.Y. 1977) ("The 'desk appearance ticket' procedure enables a qualifying defendant . . . to leave the stationhouse after the initial processing merely by accepting a written ticket requiring his appearance in court at some future time."). This procedure is often described as an arrestee being "released with a Desk Appearance Ticket[.]" *See, e.g.*, *Lovitch v. Lovitch*, No. 11 CIV. 2536 ER LMS, 2015 WL 1047807, at *3 (S.D.N.Y. Mar. 10, 2015); *see also Floyd v. City of New York*, No. 16 CIV. 8655 (LAP), 2018 WL 4360773, at *1 (S.D.N.Y. Aug. 2, 2018); ("releasing him…with a desk appearance ticket")

The decision to issue a DAT in lieu of detention is discretionary. *See Bryant v. City of New York*, 404 F.3d at 138. "An arrestee is not entitled to a DAT as a matter of right" under New York state law. *Id.* at 133 (citing *Bryant v. City of New York*, 2003 WL 22861926, at *11–12 (S.D.N.Y.

Dec. 2, 2003)). Thus, a plaintiff fails to state a claim if she argues that her rights were violated because she was eligible for but was not issued a DAT.

## IV.     The Fourth Amendment

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. Amend. IV. This bedrock of constitutional law requires courts to inquire into the "reasonableness" of any challenged police seizure. Over the years, a robust case law has developed outlining the conditions under which a person may be seized, for what purposes, and for what length of time.

A seizure occurs when "'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Arrests are the most obvious form of seizure, but other circumstances short of arrest, such as custodial interrogation, traffic stops, and brief stops of pedestrians also constitute seizures. *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 16 (1968).

### A.   Arrests and Post-Arrest Detention

The traditional Fourth Amendment rule is that police seizures of criminal suspects must be supported by probable cause that the person seized has committed or is committing a crime. *See, e.g.*, *Dunaway v. New York*, 442 U.S. 200, 208 (1979). "[T]he existence of probable cause [should] be decided by a neutral and detached magistrate whenever possible." *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975). Ideally, this determination is made before the arrest and the arrest is made pursuant to an arrest warrant signed by a magistrate. *Id.* at 113. However, arrests are also permitted based on "a policeman's on-the-scene assessment of probable cause[.]" *Id.* These warrantless arrests can be followed by "a brief period of detention to take the administrative steps incident to

8

arrest" but a judicial determination of probable cause must occur "promptly after arrest." *Id.* at 114, 125.

In *County of Riverside v. McLaughlin*, the Court provided guidance on what constitutes a "prompt" judicial determination of probable cause following a warrantless arrest. 500 U.S. 44, 55–56 (1991). The hearing is prompt, and thus the detention does not violate the Fourth Amendment, if there is no unreasonable delay. *Id.* at 55–57.  A delay of 48 hours or more before receiving a probable cause hearing is presumptively unreasonable, unless the government can show that the delay was caused by "a bona fide emergency or other extraordinary circumstance." *Id.* at 57. Pre-arraignment detentions of less than 48 hours may or may not be unreasonable, depending on the reason for the delay. *Id.* at 56.

*County of Riverside* provides the following three circumstances as examples of unreasonable delay even if the detention lasts less than 48 hours: "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id.* The Court also provided examples of delays that are *not* unreasonable, as long as the delay lasts less than 48 hours: "unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities." *Id.* at 57.

Since *County of Riverside*, neither the Supreme Court nor the Second Circuit has provided additional guidance for interpreting what constitutes an unreasonable delay. Second Circuit cases on the topic have merely restated the three examples of unreasonable delay put forth in *County of Riverside*, 500 U.S. at 56. *See Bryant*, 404 F.3d at 137; *Caravalho v. City of New York*, 732 F. App'x 18, 24 (2d Cir. 2018) (summary order); *Lebowitz v. City of New York*, 606 F. App'x 17, 18

9

(2d Cir. 2015) (summary order).

To summarize, one type of permissible seizure is a warrantless arrest based on a police officer's judgment of probable cause. That arrest may be followed by a brief period of detention for the purpose of arranging a judicial probable cause hearing, which should occur without unreasonable delay.

### B.  Other Types of Seizures

The Fourth Amendment reasonableness standard has evolved to allow other types of seizures which need not be based on probable cause. The reasonableness of a seizure may be determined through a nuanced balancing test, rather than defaulting to a probable cause requirement in all cases. *See Brown v. Texas*, 443 U.S. 47, 50 (1979). This balancing test allows for seizures without probable cause if justified by weighing "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* at 51 (citing *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 878–883 (1975).

Under this more flexible standard, temporary stops for brief questioning or a weapons frisk need only be supported by reasonable suspicion, rather than probable cause. *Terry*, 392 U.S. at 27. In some circumstances, brief stops and questioning at checkpoints are permitted to investigate whether the person seized has committed a crime, without requiring any individualized suspicion at all. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 562 (1976). These stops must be based on a special law enforcement need, and are not permitted if their "primary purpose was to detect evidence of ordinary criminal wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 41 (2000). The reasonable suspicion or "special needs" standards do not apply to actual arrests or to lengthy custodial interrogation, which are much more significant intrusions. *See Dunaway*, 442

U.S. at 209; *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001).

Of course, the Fourth Amendment "permits police to seek the voluntary cooperation of members of the public in the investigation of a crime." *Illinois v. Lidster*, 540 U.S. 419, 425 (2004). *"*[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place [and] asking him if he is willing to answer some questions[.]" *Florida v. Royer*, 460 U.S. 491, 497 (1983). However, the person approached may decline to answer law enforcement questions, and his refusal generally is not grounds for "even momentar[y]" detention. *Id.* at 498.

In very limited circumstances, the Fourth Amendment allows for temporary seizures for the purposes of seeking information from members of the general public. *Lidster*, 540 U.S. at 423–25. An "information-seeking" seizure occurs when the police detain a person for the purpose of questioning in order to elicit information "to help them apprehend, not the [person questioned], but other individuals." *Id.* at 423–24. "[A]n information-seeking stop is not the kind of event that involves suspicion, or lack of suspicion, of the relevant individual." *Id.* at 425. Brief detentions of this type are not automatically barred by the Fourth Amendment. *Id.* at 426.

The Fourth Amendment also allows for temporary suspicion-less seizures in cases involving "'an exigency that justifies immediate action on the police's part.'" *Palacios v. Burge*, 589 F.3d 556, 562 (2d Cir. 2009) (quoting *Georgia v. Randolph*, 547 U.S. 103, 117 n.6 (2006)). "[S]uch an exigency exists when the police utilize an 'appropriately tailored' seizure 'set up . . . to catch a dangerous criminal who is likely to flee by way of a particular route.'" *Id.* at 563 (quoting *Edmond*, 531 U.S. at 44).

In a Fourth Amendment balancing test, "the [state] interest in detaining witnesses for information is of relatively low value." *Maxwell v. Cty. of San Diego*, 708 F.3d at 1084. "Although

detention of witnesses for investigative purposes can be reasonable in certain circumstances, such detentions must be minimally intrusive." *Id.* at 1083–84 (holding that five-hour detention of a witness was unconstitutional); *see also Walker v. City of Orem*, 451 F.3d 1139, 1149 (10th Cir. 2006) (holding that 90-minute detention of a witness was unconstitutional). In *Lidster*, an important factor was that the seizure at issue lasted for a "few minutes at most." 540 U.S. at 427.

## V.   Application

Zarkower alleges that he was subject to an unconstitutional detention by police officers Salvatore Dimaggio, Andrew Chin, and Pablo Dejesus under the supervision of Peter Fortune. Am. Compl. ¶¶ 43–51. He asserts that his arrest was fully processed and he was cleared for release by 4:38 a.m., but he was detained for an additional five hours pursuant to an unreasonable debriefing policy. Pl.'s Mem. in Opp. to Mot. to Dismiss for Failure to State a Claim ("Pl.'s Br.") 6–7, ECF No. 26. The defendants argue that they are entitled to qualified immunity because their conduct did not violate clearly established law and was objectively reasonable.  Defs.' Mem. in Supp. Of Mot. to Dismiss for Failure to State a Claim ("Defs.' Br.") 4–9, ECF No. 24. Because, as explained below, I conclude that Zarkower's allegations present a clear case of an unreasonable and unlawful seizure, the defendants' motion is denied.

### A.  Clearly Established Law

The detention described in the complaint obviously violates clearly established Fourth Amendment law. A reasonable officer does not need a Second Circuit precedent specifically addressing "debriefing" to understand that a person should not be held in custodial detention for five hours for the sole purpose of allowing a detective to conduct an inquiry about crime in the community.

In an attempt to avoid this obvious result, the defendants focus narrowly on *County of*

*Riverside*'s statement that 48 hours of pre-arraignment detention is presumptively reasonable. Defs.' Br. at 4. They interpret *Riverside* as a blank check to detain people for 48 hours after an arrest, unless the detention is caused by one of the three examples of unreasonable delay spelled out in the decision. *See id.*; *County of Riverside*, 500 U.S. at 56 (delay of less than 48 hours before probable cause hearing is reasonable unless the arrestee can show "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake."). The defendants argue that there is no clearly established law regarding the reasonableness of pre-arraignment detention that does not fall precisely within one of those three examples. *See* Defs.' Reply in Supp. Of Mot. to Dismiss for Failure to State a Claim ("Defs.' Reply") 3, ECF No. 27. Thus, they reason, because Zarkower was detained for the purpose of debriefing, rather than one of three reasons listed in *Riverside*, a reasonable officer would not have known that the detention at issue was unlawful. *Id.* at 3, 5–6. Defendants further assert that *Riverside* in fact supports the legality of Zarkower's detention because he was not held "for any nefarious purpose" but instead a "practical reality" associated with processing the arrest. Defs.' Br. 6 ("[P]laintiff's detainment occurred because of the practical reality that he was arrested in the middle of the night and no detective was available to debrief him until the morning.").

I agree with defendants that at the time of Zarkower's detention, there was no controlling case law addressing the specific circumstance of an arrestee being issued a DAT, then detained for an additional five hours for the sole purpose of being debriefed about unrelated crimes. *See* Defs.' Br. 4. Plaintiff has cited no such case law because it does not exist. *See* Defs.' Reply 5. But that does not mean that the defendants are entitled to qualified immunity for conduct that so flagrantly violates the Fourth Amendment right to be free from unreasonable custodial detention. *See Cerrone*, 246 F.3d at 196. This is an obvious case "where the unlawfulness of the officer's conduct

is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby,* 138 S. Ct. at 590.

By focusing on *Riverside*'s rule that 48 hours of detention is presumptively reasonable, the defendants lose the forest for the trees. That particular sentence in *Riverside* exists within a world of Fourth Amendment law where all custodial arrests must be justified by probable cause. *Riverside*, building on *Gerstein*, acknowledges that the probable cause determination cannot always happen before an arrest, and in many cases, for logistical reasons, it cannot happen immediately after the arrest either. *See Cty. of Riverside*, 500 U.S. at 53. The point of *Riverside* is that there can be some delay between the arrest and the probable cause determination, as long as that delay is not unreasonable. *Id.* at 56–57.

The case before me now does not actually involve a delayed judicial probable cause determination. It involves a circumstance where police formally issued a DAT explicitly stating that there would not be a prompt judicial probable cause hearing, and that instead, the arrestee would be released to return for arraignment at a later date. *Riverside* authorizes post-arrest detention for the purposes of processing an arrest and arranging a judicial probable cause determination, while taking into account logistical realities that prevent the hearing from happening immediately upon arrest. *Riverside* does not provide any authority for detaining a person after their arrest has been fully processed and there is a formal decision made to release the person without holding a prompt probable cause hearing.

Defendants seem to take the position that because issuing a DAT is discretionary, the fact that Zarkower was issued a DAT five hours before his release is somehow irrelevant. Defs.' Br. at 4 (citing *Bryant*, 404 F.3d at 138). But defendants simultaneously acknowledge that "[i]n certain circumstances police officers may, but are not required, to issue a DAT to an arrestee *rather than*

14

*hold him in custody until a judge is available.*" *Id.* at 4–5 (citing N.Y. C.P.L. § 150.20(20(2)(a))
(emphasis added). In the hours following a warrantless arrest, police officers are faced with a
binary choice of either detaining an arrestee until a judge is available for a probable cause hearing
or releasing the arrestee pursuant to a DAT. That decision is to be made within the officer's
discretion. But once the second option is chosen, the detention is no longer justified by *Riverside*.
This case does not involve a question of whether issuing a DAT is discretionary. Zarkower asserts
that he was issued a DAT. Once he received the DAT, it was clear that he was not going to be
promptly arraigned, and the constitutional reason for the detention evaporated.

The defendants' attempt to justify the five-hour delay by claiming "practical realities"
overlooks the fact that the *County of Riverside* Court was talking about the practical realities that
would cause the "probable cause determination [to be] delayed unreasonably." 500 U.S. at 56. The
fact that there would be no detective on duty was a "practical reality" of operations at the precinct
where Zarkower was detained. But that practical reality had absolutely nothing to do with
facilitating a probable cause hearing. Everyone knew there was not going to be a prompt probable
cause hearing. The debriefing by a detective was completely unrelated.

Waiting for a detective to debrief Zarkower was also not an "administrative step[] incident
to arrest[.]" *Gerstein v. Pugh*, 420 U.S. 114. This is obvious from the complaint, because
Zarkower's arrest was processed and he was issued a DAT long before the debriefing. Am. Compl.
¶ 19. But on a more fundamental level, asking someone questions about crime in the neighborhood
cannot possibly be a necessary step to processing an arrest. While states have leeway in designing
post-arrest procedures, they cannot simply label something "incident to arrest" when it has nothing
to do with the arrest or the arrestee.

Zarkower alleges he was detained for an altogether different purpose than contemplated in

15

*Gerstein* and *Riverside*. He asserts that he was locked in a cell for five hours, "for the sole purpose of being questioned by a detective who came on duty in the morning[.]" Am. Compl. ¶ 20. He says he was questioned regarding "whether he knew about crimes in the neighborhood, such as break-ins and assaults, and whether plaintiff had guns in his home." *Id.* ¶ 21; *see also* NYPD PG Pro. No. 210-18 at 1 (describing debriefing procedure for questioning prisoners about "crime that is not related to the current arrest charges against the prisoner.").

The idea that police officers would be permitted to subject someone to hours of detention for the sole purpose of asking general questions about crime in the community flies in the face of all Fourth Amendment doctrine on seizures of a person. It is well established that all seizures must be reasonable, and in the vast majority cases, suspicion-based. *See supra* Section IV. Custodial detentions, in particular, must be justified by probable cause. *Id.* A desire to question a person who may or may not be a witness to any crime is not even supported by an articulable reasonable suspicion, let alone probable cause. The only case law tending to support something at all close to detention for purposes of debriefing is the "information-seeking" detention in *Lidster*, which authorized a traffic stop of *minutes* to inquire about a *specific crime* that occurred in the neighborhood. *Lidster*, 540 U.S. at 427. The *Lidster* Court emphasized that a brief traffic stop under these circumstances was permissible because it was not "likely to provoke anxiety or to prove intrusive." *Id.* at 425. The same cannot be said for locking a person in a cell for five hours.

Defendants state that the plaintiff does not allege that the defendants detained him for "any nefarious purpose[.]" Defs.' Br. at 6. But I do see something nefarious alleged in the complaint. Locking someone up in a cell for hours to question him about what his neighbors have been up to is conduct associated with police states. It is the exact type of arbitrary and invasive seizure the Fourth Amendment is designed to protect against. Of course, police can constitutionally request

voluntary assistance in gaining information about crime in the community. They can ask questions on these topics from people in custody, just as they may approach members of the general public on the street to ask questions. In limited circumstances, they can *briefly* seize a person in a traffic stop to ask a couple of questions. *See Lidster*, 540 U.S. at 427. There may be some rare circumstances, typically involving exigency, where a seizure of a direct witness to a crime may be permissible. *See Palacios v. Burge*, 589 F.3d 556, 562 (2d Cir. 2009) (quoting *Georgia v. Randolph*, 547 U.S. 103, 117 n.6 (2006)). But the police cannot detain a person for five hours simply because they want to ask him questions about what he knows about possible criminal activity on the part of his neighbors. Allowing such detentions would be a serious infringement on individual liberty and autonomy.

To be clear, I am not stating that Zarkower's initial arrest was not supported by probable cause. That is not in question. But once his arrest was fully processed and officials formally decided by giving him a DAT that he would not be held for arraignment, the initial reason for the arrest became irrelevant. The detention was no longer about the original arrest, where he was detained based on the officer's judgment of probable cause. His detention transformed into a suspicionless custodial hold of a person who may or may not have witnessed some crime. No reasonable officer could reasonably think that was constitutional.

Some actions are so outrageous and so obviously unconstitutional that reasonable officers are on notice without a case addressing similar facts. *See Hope v. Pelzer*, 536 U.S. at 741.  The fact that there is no Second Circuit precedent addressing detention for purposes of "debriefing" does not absolve police officers from understanding that *Riverside* authorizes a brief detention for purposes of processing the arrest and arranging a probable cause hearing and nothing more. Nothing in *Riverside* could be interpreted to authorize detaining someone for the sole purpose of

17

asking questions about crime in the community. The Supreme Court has rejected much more minor suspicionless intrusions if the "primary purpose was to detect evidence of ordinary criminal wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. at 41. The Court approved of information-seeking detentions only in the very narrow circumstance of a brief traffic stop to ask questions about a specific crime that recently occurred nearby. *Lidster*, 540 U.S. at 427. There is no doubt from the *Lidster* opinion that if the facts were changed to involve a five-hour detention in a jail cell, rather than a minutes-long traffic stop, the detention would have been deemed unreasonable and unconstitutional.

In some cases involving Fourth Amendment rights, it will be "difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Saucier*, 533 U.S. at 205). In those close cases, a precedent addressing similar facts may be necessary to give officers adequate notice of whether a particular circumstance falls on one side or the other of the Fourth Amendment "reasonableness" line. This is not one of those cases. This is an obvious case of an unreasonable, unconstitutional seizure.

### B. Objective Reasonableness

Defendants have not presented any case that their conduct could have been objectively reasonable other than their incorrect claim that the law was not clearly established. Because the law was, in fact, clearly established, there is no real question that plaintiff has alleged objectively unreasonable conduct by each defendant officer. All police officers know, or should know, the basic rule that following a warrantless arrest, the next steps are to process the arrest and hold the person for a probable cause hearing or release the person. All police officers know, or should know, that issuing a DAT to an arrestee means that he will be arraigned at a later date, rather than

being detained until his arraignment. All police officers know, or should know, that they cannot lock a person up because they want to ask him general questions about crime in the neighborhood. On the face of the complaint, there is no reason to think this was a situation where there was some mistake of fact or other confusion as to why Zarkower was being detained. The complaint allows for the inference that each of the defendant officers was aware of the facts surrounding Zarkower's detention.

Defendants Dimaggio and Chin processed Zarkower's arrest, issued a DAT, and then continued to detain him for an additional five hours. Am. Compl. ¶¶ 19, 21. These allegations mean that both of those officers knew that Zarkower had been cleared for release, and that his continued detention was for the unconstitutional purpose of debriefing. Zarkower alleges that Dimaggio even told him that this was the reason. *Id.* ¶ 21. This alleged conduct is not objectively reasonable.

Defendant Dejesus questioned Zarkower for five minutes before he was finally released. *Id.* ¶ 21. Drawing all inferences in favor of the plaintiff, I assume for purposes of this motion to dismiss that Dejesus was aware that Zarkower had been cleared for release hours earlier and that he had been detained for the sole purpose of being debriefed. I cannot conclude at this stage that he acted objectively reasonably by prolonging a flagrantly unconstitutional detention, even if only by five minutes.

Finally, Zarkower alleges supervisory liability against defendant Fortune, a supervisor at the precinct who Zarkower claims was responsible for implementing and promulgating the debriefing policy. *Id.* ¶ 21. No reasonable supervisor would implement a policy whereby arrestees authorized for release were locked up for hours for the sole purpose of debriefing. Fortune's alleged conduct is not objectively reasonable.

**CONCLUSION**

For the reasons described above, the defendants' motion to dismiss is denied. On the face of the complaint, the individual officers are not entitled to qualified immunity from liability for the flagrant Fourth Amendment violation alleged.

SO ORDERED.

_____
Allyne R. Ross
United States District Judge

Dated:     May 21, 2020
           Brooklyn, New York

20